**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIMMY AHMED, CLAY HARRIS, and DAWN VAN DER STEEG, individually and on behalf of all others similarly situated, | Case No.: 2:21-cv-06890-JS-ST |
| Plaintiffs, | **FIRST CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| WALMART INC., | |
| Defendant. | |

Plaintiffs Jimmy Ahmed, Clay Harris, and Dawn Van der Steeg ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, bring this class action complaint against Defendant Walmart Inc. ("Defendant") and allege the following upon information and belief, except for those allegations pertaining to Plaintiffs, which are based on personal knowledge:

<u>**NATURE OF THE ACTION**</u>

1. This is a class action lawsuit regarding Defendant's manufacturing, distribution, advertising, marketing, and sale of Equate brand antiperspirant aerosol and spray products ("Products") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2. The presence of benzene in the Products renders them adulterated, misbranded, and illegal to sell under federal and state law.

3. Defendant knew or should have known that the Products contained benzene, but Defendant misrepresented, omitted, and concealed this fact to consumers, including Plaintiffs and

1

Class members, by not including benzene on the Product label or otherwise warning about its presence.

4.      Plaintiffs and Class members reasonably relied on Defendant's representations that the Products were safe, unadulterated, and free of any carcinogens that are not listed on the label.

5.      Plaintiffs and Class members purchased and used the Products and were therefore exposed to or risked being exposed to the harmful levels of benzene in the Products.

6.      The Products are worthless because they contain or risked containing benzene, a known human carcinogen that is an avoidable ingredient in the Products and their manufacturing process.  Indeed, the presence of benzene renders the Products adulterated, misbranded, and illegal to sell.

7.      Defendant is therefore liable to Plaintiffs and Class members for selling the Products without disclosing that the Products contain or risk containing benzene.

**PARTIES**

**I.  Plaintiffs**

8.      Plaintiff Jimmy Ahmed is a citizen and resident of New York. During the applicable statute of limitations period, Plaintiff Ahmed purchased Defendant's Equate Dry Spray Antiperspirant Cucumber product that contained benzene from Walmart retail stores in New York.

9.      Plaintiff Clay Harris is a citizen and resident of Ohio. From 2015 through December of 2021, Plaintiff Harris purchased Defendant's Equate aerosol antiperspirants that contained benzene from Walmart retail stores located in St. Clairsville, Ohio, Weirton, West Virginia, and Moundsville, West Virginia.

10. Plaintiff Dawn Van der Steeg is a citizen and resident of Florida. In or about February 2021, Plaintiff Van der Steeg purchased Defendant's Equate Dry Spray Antiperspirant Cucumber product that contained benzene from Walmart retail stores in Florida.

11. When purchasing the Products, Plaintiffs reviewed the accompanying labels and disclosures and understood them as representations and warranties by Defendant that the Products were properly manufactured, free from defects, and safe for their intended use. Plaintiffs relied on these representations and warranties when deciding to purchase the Products, and these representations and warranties were part of the basis of the bargain. Had Defendant not made the false, misleading, and deceptive representations and omissions regarding the Products containing or risking containing benzene, Plaintiffs would not have been willing to purchase the Products. The Products Plaintiffs purchased were worthless because they either contained or risked containing the known carcinogen benzene. Accordingly, Plaintiffs were injured in fact and lost money as a result of Defendant's improper conduct.

## II. Defendant

12. Defendant Walmart Inc. is a Delaware corporation with its principal place of business in Bentonville, Arkansas. Defendant sells Equate brand antiperspirant aerosol and spray products throughout the United States. These Products, including those purchased by Plaintiffs and Class members, are available at Walmart retail stores throughout the United States. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Products.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of

$5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims within the Court's original jurisdiction.

14.    This Court has personal jurisdiction over Defendant because the claims asserted in this complaint arise out of Defendant's contacts with this district. Defendant has consented to personal jurisdiction in this district with respect to Plaintiffs Harris and Van der Steeg's individual claims.

15.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this complaint occurred in this state. Defendant has consented to venue in this district with respect to Plaintiffs Harris and Van der Steeg's individual claims.

## FACTUAL ALLEGATIONS

### I.  Benzene Is a Known Human Carcinogen

16.    The World Health Organization and the International Agency for Research on Cancer have classified benzene as a Group 1 compound thereby defining it as "carcinogenic to humans."[1]

17.    The Department of Health and Human Services has determined that benzene causes cancer in humans.[2]

---

[1] *IARC Monographs on the Identification of Carcinogenic Hazards to Humans: List of Classifications*, WHO, https://monographs.iarc.who.int/list-of-classifications (last updated July 1, 2022).

[2] *Facts About Benzene*, CDC (last updated Apr. 4, 2018) https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

18.    "IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma."[3]

19.    Benzene exposure has been linked with acute lymphocytic leukemia, chronic lymphocytic leukemia, multiple myeloma, and non-Hodgkin lymphoma.[4]

20.    The NIOSH and CDC identify "target organs" associated with human exposure to benzene to include: "eyes, skin, respiratory system, blood, central nervous system, bone marrow.[5]

21.    The CDC warns that "[b]enzene works by causing cells not to work correctly. For example, it can cause bone marrow not to produce enough red blood cells, which can lead to anemia. Also, it can damage the immune system by changing blood levels of antibodies and causing the loss of white blood cells."[6]

## II.  Benzene Is Primarily Used in Industrial Processes and Is Highly Regulated

22.    The CDC states that "[s]ome industries use benzene to make other chemicals that are used to make plastics, resins, and nylon and synthetic fibers. Benzene is also used to make some types of lubricants, rubbers, dyes, detergents, drugs, and pesticides."[7]

23.    Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.[8]

---

[3] *Benzene and Cancer Risk*, American Cancer Society (last updated Jan. 5, 2016) https://www.cancer.org/cancer/cancer-causes/benzene.html.
[4] *Id.*
[5] *NIOSH Pocket Guide to Chemical Hazards: Benzene*, CDC, https://www.cdc.gov/niosh/npg/npgd0049.html (last updated Oct. 30, 2019).
[6] *Facts About Benzene*, *supra*.
[7] *Id.*
[8] *Benzene*, National Cancer Institute, https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene (last updated Jan. 14, 2019).

24.     The FDA currently recognizes the danger of benzene and, as a result, has claimed it should not be used in the manufacture of any component of a drug product due to its unacceptable toxicity effect.[9]

25.     Where the use of benzene or other Class 1 solvents is unavoidable, the FDA has stated that the levels should be restricted, and benzene is restricted under such guidance to 2 parts per million ("ppm").[10]

## III.  Exposure to Benzene in any Amount Is Extremely Dangerous

26.     A 1939 study on benzene stated that "exposure over a long period of time to any concentration of benzene greater than zero is not safe."[11]

27.     A 2010 study summarized the epidemiological studies of the carcinogenic effects of benzene exposure and provided an overview of the hematotoxic effects of benzene.[12] The study concluded:

a.  There is probably *no safe level* of exposure to benzene, and *all exposures* constitute some risk in a linear, if not supralinear, and additive fashion.

b.  Exposure to benzene can lead to multiple alterations that contribute to the leukemogenic process, indicating a multimodal mechanism of action.

---

[9] David Light et al., *Valisure Citizen Petition on Benzene in Body Spray Products* (Nov. 3, 2021), https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf.

[10] *Id.*

[11] F.T. Hunter, *Chronic Exposure to Benzene (Benzol): The Clinical Effects*, 21 J. Indus. Hygiene & Toxicology 331 (1939), https://www.cabdirect.org/cabdirect/abstract/19402700388.

[12] Martyn T. Smith, *Advances in Understanding Benzene Health Effects and Susceptibility*, 31 Ann. Rev. Pub. Health 133 (2010), https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.103646.

c.  Benzene is a ubiquitous chemical in our environment that causes acute leukemia and probably other hematological cancers.

28.    The CDC has stated that ways in which people "could be exposed to benzene" include[13]:

a.  Outdoor air contains low levels of benzene from tobacco smoke, gas stations, motor vehicle exhaust, and industrial emissions.

b.  Indoor air generally contains levels of benzene higher than those in outdoor air. The benzene in indoor air comes from products that contain benzene such as glues, paints, furniture wax, and detergents.

c.  The air around hazardous waste sites or gas stations can contain higher levels of benzene than in other areas.

d.  Benzene leaks from underground storage tanks or from hazardous waste sites containing benzene can contaminate well water.

e.  People working in industries that make or use benzene may be exposed to the highest levels of it.

f.  A major source of benzene exposure is tobacco smoke.

29.    The NIOSH and CDC identify "exposure routes" for benzene to include: "inhalation, skin absorption, ingestion, skin and/or eye contact."[14]

30.    "Direct exposure [to benzene] of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[15]

---

[13] *Facts About Benzene, supra.*
[14] *NIOSH Pocket Guide, supra.*
[15] *Facts About Benzene, supra.*

31.     Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

32.     Benzene exposure from body sprays is especially troubling because the spray is put directly onto the skin, with the remnants flying through the air likely to be at least partially inhaled by the user and absorbed into their lungs. Thus, even a relatively low concentration limit can result in very high total benzene exposure.

**IV.  Discovery of Benzene in the Products**

33.     Due to the substantial harm to humans caused by exposure to chemicals such as benzene, companies have been founded with the specific goal of preventing defective products containing said harmful chemicals from reaching consumers. Valisure is a company with a core mission "to help ensure the safety, quality and consistency of medications and supplements in the market."[16]

34.     "Valisure operates an analytical laboratory that is accredited under International Organization for Standardization ('ISO/IEC') 17025:2017 standards for chemical testing (PJLA Accreditation Number 94238)."[17]

35.     "Valisure is registered with the Drug Enforcement Administration (License # RV0484814) and FDA (FEI #: 3012063246)."[18]

36.     Valisure has tested for specific chemical qualities in numerous types of products, such as N-Nitrosodimethylamine in ranitidine and metformin and benzene in hand sanitizers and sun care products. Each time, Valisure's detection of benzene and other carcinogens has been

---

[16] *Valisure Citizen Petition*, *supra*.
[17] *Id.*
[18] *Id.*

independently confirmed by the industry and led to recalls by manufacturers over the subject products.

37.    On November 3, 2021, Valisure tested for benzene in various types of antiperspirants utilizing gas chromatography and detection by mass spectrometry ("GC-MS") instrumentation that allows mass spectral separation.[19]

38.    GC-MS "is generally considered one of the most accurate analyses available."[20] Indeed, the FDA used the same method to test for impurities like benzene in hand sanitizers.[21]

39.    "The GC-MS method described in this petition utilized body temperature (37°C) for oven incubation. 40°C has been previously used for benzene analysis from liquid pharmaceuticals and beverages, and reduced false positive results compared with higher-temperature incubation."[22]

40.    Valisure analyzed 108 unique batches from 30 brands of deodorant and antiperspirant aerosol products.[23]

41.    Valisure "detected high levels of benzene and other contaminants in specific batches of body spray products, some of which contain active pharmaceutical ingredients aluminum chlorohydrate or aluminum sesquichlorohydrate."[24]

---

[19] *Id.*

[20] *GC/MS Analysis*, Element, https://www.element.com/materials-testing-services/chemical-analysis-labs/gcms-analysis-laboratories (last visited July 20, 2022).

[21] *Direct Injection Gas Chromatography Mass Spectrometry (GC-MS) Method for the Detection of Listed Impurities in Hand Sanitizers*, FDA (Aug. 24, 2020), https://www.fda.gov/media/141501/download.

[22] *Valisure Citizen Petition*, *supra*.

[23] *Id.*

[24] *Id.*

42.     Valisure identified twenty-four body spray products or product line batches which contained levels of benzene at 2 ppm or higher, including the Products.[25]

43.     Valisure's testing results were confirmed by recalls of antiperspirant products by Procter & Gamble, Helen of Troy, and Unilever.

44.     The lowest level of benzene found in Defendant's Products is 3.21 ppm, or 60.5% higher than the 2 ppm concentration limit for "unavoidable" uses per FDA guidance.[26]

45.     The highest level of benzene found in Defendant's Products is 6.15 ppm, or more than 3 times the concentration limit for "unavoidable" uses per FDA guidance.[27]

46.     However, because benzene is not a requisite component of manufacturing or packaging body sprays, its presence in the Products is not unavoidable and "any significant detection of benzene should be deemed unacceptable."[28]

47.     David Light, Founder and Chief Executive Officer of Valisure, stated that "[t]he presence of this known human carcinogen in body spray products regularly used by adults and adolescents in large volumes makes this finding especially troubling."[29]

48.     The Products are not designed to contain benzene, and no amount of benzene is acceptable in antiperspirant sprays such as the Products manufactured, distributed, and sold by Defendant. Further, although Defendant lists both active and inactive ingredients on the Products' labels, Defendant failed to disclosure that the Products contain benzene.

**V.   Benzene Renders the Products Adulterated, Misbranded, and Illegal to Sell**

---

[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] *Id*.
[29] *Id*.

49.    "Antiperspirant body spray products are considered over-the-counter drugs and certain deodorant body sprays are considered cosmetics that are regulated by the U.S. Food and Drug Administration."[30]

50.    The FDA has several safety and effectiveness regulations in place that govern the manufacture and marketing of all antiperspirant and deodorant products, including safety data on its ingredients.[31]

51.    As OTC drug products regulated by the FDA, the Products must be both safe and effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state law analogues. These cGMP regulations require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).

52.    The cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." 21 C.F.R. § 210.1(a). In other words, entities at all phases of the design, manufacture, and distribution chain are bound by these requirements.

53.    The cGMPs set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart

---

[30] *Id.*

[31] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated*, FDA, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last updated Mar. 2, 2022).

F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K). The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

54.    Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B). States have enacted laws adopting or mirroring these federal standards.

55.    FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

56.    A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

57.    "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6).

58.     FDA guidance permits up to 2 ppm benzene in a product if its use in the manufacturing process is "unavoidable."[32]

59.     Regardless, "[b]ecause many of the body spray products Valisure tested did not contain detectable levels of benzene, it does not appear that benzene use is unavoidable for their manufacture, and considering the long history and widespread use of these products, it also does not appear that they currently constitute a significant therapeutic advance."[33]

60.     Regardless, Defendant's Products contain levels of benzene above 2 ppm.[34]

61.     Defendant could have avoided any potential for benzene contamination in the Products by changing the manufacturing process or raw ingredients, and the Products could have been sold with absolutely no risk of benzene in them.

62.     The presence of benzene—and Defendant's failure to comply with cGMPs—renders the Products both adulterated and misbranded under the FDCA. The Products are adulterated because they are "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(1).

63.     The Products are misbranded because their labeling is "false" and "misleading" because it does not disclose the presence of benzene. 21 U.S.C. § 352(a)(1).

---

[33] *Valisure Citizen Petition*, *supra*.
[33] *Valisure Citizen Petition*, *supra*.
[34] *Id*.

64.    A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold. 21 U.S.C. § 331(a). Adulterated and misbranded products thus have no economic value and are legally worthless.

65.    As a seller of an OTC drug product, Defendant had and has a duty to ensure that its Products did not and do not contain excessive (or any) level of benzene, including through regular testing. But based on Valisure's testing results set forth above, Defendant made no reasonable effort to test its Products for benzene or other impurities. Nor did it disclose to Plaintiffs in any advertising or marketing that its antiperspirant products contained benzene, let alone at levels that are many multiples of the emergency, interim limit set by the FDA. To the contrary, Defendant represented and warranted, expressly and impliedly, that the Products were of merchantable quality, complied with federal and state law, and did not contain carcinogens, reproductive toxins, or other impurities such as benzene.

## VI.    Defendant's Knowledge, Misrepresentations, Omissions, and Concealment of Material Facts

66.    The Products contain butane as a propellant, which Valisure identified as a potential source of contamination of benzene.

67.    Aerosols contain volatile hydrocarbons, like butane or isobutane, as propellants. These propellants are derived from crude oil and manufactured in oil refineries where a variety of other hydrocarbons, including benzene, are produced.

68.    Because the chemicals are derived from the same sources in the same facilities, there is high potential for benzene contamination in the processing of butane.

69.    Manufacturing companies that work with butane understand the risks of benzene contamination.[35]

70.    Defendant, a large, sophisticated corporation in the business of manufacturing, distributing, and selling products containing aerosol propellants such as butane, knew or should have known of the risks of benzene contamination.

71.    Defendant's use of butane as a propellant therefore put them on notice of the risk of benzene contamination in the Products.

72.    Defendant continues to sell dry spray antiperspirant products containing butane despite Defendant's knowledge of the risk of benzene contamination.

73.    Federal and state regulatory regimes require that labeling for OTC products identify each active and inactive ingredient.[36]

74.    An "active ingredient" is "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body of humans. The term includes those components that may undergo chemical change in the manufacture of the drug product and be present in the drug product in a modified form intended to furnish the specified activity or effect." 21 C.F.R. 201.66(b)(2).

75.    Benzene is not listed on the Product labels as either an active or inactive ingredient, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products. Below is a screenshot from Defendant's website:

---

[35] *See, e.g.*, *Butane Safety Data Sheet*, Whiting, https://whiting.com/wp-content/uploads/Butane-SDS.pdf (last updated Oct. 30, 2013) ("MAY CONTAIN TRACE AMOUNTS OF BENZENE WHICH CAN CAUSE CANCER OR BE TOXIC TO BLOOD-FORMING ORGANS.").

[36] *Guidance for Industry National Uniformity for Nonprescription Drugs — Ingredient Listing for OTC Drugs*, FDA (Apr. 1998), https://www.fda.gov/media/72250/download.

Ingredients                                                    ∧

**Inactive Ingredients**
Inactive Ingredients: Butane, Hydrofluorocarbon 152a, Cyclopentasiloxane, PPG-14 Butyl Ether, Fragrance, Helianthus Annuus
(Sunflower) Seed Oil, Disteardimonium Hectorite, C12-15 Alkyl Benzoate, BHT, Octyldodecanol, Propylene Carbonate,
Dimethiconol, Tocopheryl Acetate

**Ingredients**
Inactive Ingredients: Butane, Hydrofluorocarbon 152a, Cyclopentasiloxane, PPG-14 Butyl Ether, Fragrance, Helianthus Annuus
(Sunflower) Seed Oil, Disteardimonium Hectorite, C12-15 Alkyl Benzoate, BHT, Octyldodecanol, Propylene Carbonate,
Dimethiconol, Tocopheryl Acetate

**Active Ingredients**
Aluminum Chlorohydrate (20.2%)

76.    As such, Defendant's advertising campaigns are false and misleading. The presence of benzene in the Products renders the Products illegal and unfit for sale in trade or commerce. Plaintiffs would not have purchased the Products had they been truthfully and accurately labeled.

77.    If Defendant had not routinely disregarded the FDA's cGMPs, or had fulfilled their quality assurance obligations, Defendant would have identified the presence of the benzene contaminant almost immediately through routine and required testing.

78.    Further, had Defendant adequately tested its Products for benzene and other carcinogens, reproductive toxins, and impurities, it would have discovered that its Products contained benzene at levels above the FDA's limit (to the extent even applicable), making those products ineligible for distribution, marketing, and sale.

79.    Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, meaning that it is "carcinogenic to humans."

80.    Accordingly, Defendant knowingly, recklessly, or at least negligently, introduced contaminated, adulterated, and misbranded Products containing or risked containing dangerous amounts of benzene into the U.S. market.

81.    Defendant has refused to recall the Products or issue any guidance to consumers who continue to use the Products, even though Defendant knows that the Products are contaminated with benzene.

82.    Unlike Defendant, other companies, such as Proctor & Gamble, which Valisure found to have benzene in their spray antiperspirant products, have taken the first step in remedying the benzene contamination by recalling their products.[37]

83.    By marketing and selling its body spray products in the stream of commerce with the intent that its Products would be purchased by Plaintiffs and Class Members, Defendant warrants that the Products are safe to use rather than adulterated body sprays containing a dangerous, cancer-causing chemical.

84.    Defendant did not disclose the actual or potential presence of benzene in its antiperspirant products on the Products' labeling, advertising, marketing, or sale of the Products.

85.    Defendant's concealment was material and intentional because people are concerned with what is in the products that they are putting onto and into their bodies. Consumers such as Plaintiffs and Class members make purchasing decisions based on the ingredients listed. Defendant knows that if it had not omitted that the Products contained benzene, then Plaintiffs and Class members would not have purchased the Products.

## VII.  Injuries to Plaintiffs and Class Members

86.    When Plaintiffs purchased Defendant's Products, Plaintiffs did not know, and had no reason to know, that Defendant's Products contained or risked containing the harmful

---

[37] *P&G Issues Voluntary Recall of Aerosol Dry Conditioner Spray Products and Aerosol Dry Shampoo Spray Products*, Proctor & Gamble (Dec. 17, 2021), https://news.pg.com/news-releases/news-details/2021/PG-Issues-Voluntary-Recall-of-Aerosol-Dry-Conditioner-Spray-Products-and-Aerosol-Dry-Shampoo-Spray-Products/default.aspx.

carcinogen benzene. Not only would Plaintiffs not have purchased Defendant's Products had they known the Products contained benzene, but they would also not have been capable of purchasing them if Defendant had done as the law required and tested the Products for benzene and other carcinogens, reproductive toxins, and impurities.

87.    Consumers lack the ability to test or independently ascertain or verify whether a product contains unsafe substances, such as benzene, especially at the point of sale, and therefore must and rely on Defendant to truthfully and honestly report what the Products contain on the Products' packaging or labels.

88.    When consumers look at the Products' packaging, there is no mention of benzene. Benzene is not listed in the ingredients section, nor is there any warning about the inclusion (or even potential inclusion) of benzene in the Products. This leads reasonable consumers to believe the Products do not contain benzene.  Indeed, these expectations are reasonable because if the Products are manufactured properly, benzene will not be present in then Products.

89.    No reasonable consumer would have paid any amount for products containing benzene, a known carcinogen and reproductive toxin, much less above the limits set by the FDA (even assuming those allowances apply to Defendant's Products).

90.    Thus, if Plaintiffs and Class members had been informed that Defendant's Products contained or may contain benzene, they would not have purchased or used the Products, or would have paid significantly less for the Products, making such omitted facts material to them.

91.    Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the ingredients of the Product are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiffs and the Class Members.

92.     Plaintiffs and Class members bargained for an antiperspirant product free of contaminants and dangerous substances. Plaintiffs and Class members were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene, and Defendant failed to warn consumers of this fact. Such illegally sold products are worthless and have no value.

93.     Plaintiffs and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and injunctive relief.

## CLASS ALLEGATIONS

94.     Plaintiffs, individually and on behalf of all others, bring this class action pursuant to Fed. R. Civ. P. 23.

95.     Plaintiffs seek to represent a class defined as:

> All persons who purchased one or more of Defendant's Products in the United States for personal or household use within any applicable limitations period ("Nationwide Class").

96.     Plaintiff Van Der Steeg also seeks to represent a subclass defined as:

> All persons who purchased one or more of Defendant's Products in Florida for personal or household use within any applicable limitations period ("Florida Subclass").

97.     Plaintiff Ahmed also seeks to represent a subclass defined as:

> All persons who purchased one or more of Defendant's Products in New York for personal or household use within any applicable limitations period ("New York Subclass").

98.     Plaintiff Harris also seeks to represent a subclass defined as:

> All persons who purchased one or more of Defendant's Products in Ohio for personal or household use within any applicable limitations period ("Ohio Subclass").

99.     Plaintiff Harris also seeks to represent a subclass defined as:

All persons who purchased one or more of Defendant's Products in West Virginia for personal or household use within any applicable limitations period ("West Virginia Subclass").

100.    Excluded from the Class and Subclasses are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the Products.

101.    Plaintiffs reserve the right to modify, change, or expand the definitions of the Class based upon discovery and further investigation.

102.    *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

103.    *Commonality*: Questions of law or fact common to the Class include, without limitation:

a.    Whether the Products contain benzene;

b.    Whether a reasonable consumer would consider the presence of benzene in the Products to be material;

c.    Whether Defendant knew or should have known that the Products contain benzene;

d.    Whether Defendant misrepresented whether the Products contain benzene;

e.    Whether Defendant failed to disclose that the Products contain benzene;

f.    Whether Defendant concealed that the Products contain benzene;

g.    Whether Defendant engaged in unfair or deceptive trade practices;

h.   Whether Defendant breached an express warranty;

i.   Whether Defendant breached an implied warranty;

j.   Whether Defendant engaged in fraud;

k.   Whether Defendant was unjustly enriched; and

l.   Whether Plaintiffs and Class members are entitled to damages and equitable relief.

104.   *Typicality*: Plaintiffs' claims are typical of the claims of Class members. Plaintiffs and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

105.   *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case. Counsel intends to vigorously prosecute this action.

106.   *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims. Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and

comprehensive supervision by a single court. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

107.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

### INJUNCTIVE CLASS RELIEF

108.    Defendant has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

109.    Prosecuting separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendant and that would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

110.    Defendant's conduct was uniformly directed to all consumers, including Plaintiffs and Class members. Thus, all consumers have a common interest in enjoining Defendant's unlawful conduct.

111.    Plaintiffs seek to enjoin Defendant's misleading and deceptive labeling of the Products.

112.    Any final injunctive relief or declaratory relief would benefit the entire Class as Defendant would be prevented from continuing its misleading and deceptive marketing practices and would be required to honestly disclose to consumers the true nature of the contents of the Products.

113.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(1) and (2).

## CAUSES OF ACTION

### COUNT I
**BREACH OF EXPRESS WARRANTY**
**(On behalf of Plaintiffs and the Nationwide Class)**

114.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

115.    Defendant provided Plaintiffs and Class members with an express warranty in the form of written affirmations of fact promising and representing that the Products are safe for use and do not contain benzene.

116.    The above affirmations of fact were not couched as "belief" or "opinion" and were not "generalized statements of quality not capable of proof or disproof."

117.    These affirmations of fact became part of the basis for the bargain and were material to Plaintiffs and Class members' transactions.

118.    Plaintiffs and Class members reasonably relied upon Defendant's affirmations of fact and justifiably acted in ignorance of the material facts omitted or concealed when they decided to buy Defendant's Products.

119.    Defendant knowingly breached the express warranties by including benzene in the Products sold to Plaintiffs and Class members without properly notifying them of its inclusion in the Products.

120.    Within a reasonable time after it knew or should have known, Defendant did not change the Products' labels to include benzene in the ingredient list.

121.    Defendant received direct, mailed notice from individuals related to the claims at issue in this Consolidated Amended Complaint, and specifically Defendant's breaches of its warranties. Plaintiff Van der Steeg sent a notice letter on November 23, 2021, and Plaintiff Harris mailed a notice letter on December 14, 2021.  Specifically, as of November 23, 2021, direct notice was sent to Defendant to inform it of its breaches of express and implied warranties by Plaintiffs. These notice letters provided notice of Defendant's breach and demanded that Defendant correct or rectify the breach complained of herein.

122.    Furthermore, affording Defendant an opportunity to cure its breach of warranties would be unnecessary and futile here. Defendant was placed on reasonable notice of the defect in the Products and breach of the warranties by the Valisure Citizen Petition. Accordingly, Defendant had had ample opportunity to cure the defect for Plaintiffs and Class members but has failed to do so.

123.    Defendant also has notice of its breach as set forth herein by virtue of the news reports surrounding this subject.

124.    As a direct and proximate result of Defendant's breach of the express warranties, Plaintiffs and Class members were damaged in the amount of the price they paid for the Products, in an amount to be proven at trial.

125.    As a direct and proximate result of Defendant's breaches of its express warranty and failure of Defendant's Products to conform to its representations as warranted, Plaintiffs and Class Members have been damaged in that they did not receive the product as specifically warranted and/or purchased a product that they otherwise would not have purchased (or paid a premium for) if they knew it did not conform to Defendant's warranties

## COUNT II

24

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On behalf of Plaintiffs and the Nationwide Class)

126.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

127.    Defendant sold and Plaintiffs and Class members purchased the Products.

128.    When sold by Defendant, the Products were not merchantable, did not pass without objection in the trade under the label description, were not of adequate quality within that description, were not fit for the ordinary purposes for which such goods are used, and did not conform to the promises or affirmations of fact made on the Products' containers or labels.

129.    Because the Products contains benzene, they are in no way safe for use as body spray products.

130.    Defendant received direct, mailed notice from individuals related to the claims at issue in this Consolidated Amended Complaint, and specifically Defendant's breaches of its warranties. Plaintiff Van der Steeg sent a notice letter on November 23, 2021, and Plaintiff Harris mailed a notice letter on December 14, 2021.  Specifically, as of November 23, 2021, direct notice was sent to Defendant to inform it of its breaches of express and implied warranties by Plaintiffs. These notice letters provided notice of Defendant's breach and demanded that Defendant correct or rectify the breach complained of herein.

131.    Furthermore, affording Defendant an opportunity to cure its breach of warranties would be unnecessary and futile here. Defendant was placed on reasonable notice of the defect in the Products and breach of the warranties by the Valisure Citizen Petition. Accordingly, Defendant had had ample opportunity to cure the defect for Plaintiffs and Class members but has failed to do so.

132.    Defendant also has notice of its breach as set forth herein by virtue of the news reports surrounding this subject.

133.    As a direct result of Defendant's Products being unfit for their intended purpose or otherwise not merchantable, Plaintiffs and Class members were damaged because they would not have purchased Defendant's Products had they known the true facts regarding the benzene content.

**COUNT III**
**FRAUD**
**(On behalf of Plaintiffs and the Nationwide Class)**

134.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

135.    Defendant made fraudulent misrepresentations to Plaintiffs and Class members regarding the Products, specifically that the Products contained only the active and inactive ingredients stated on the label, and not harmful impurities such as benzene. Defendant also materially omitted facts from Plaintiffs and Class members, including that the Products in fact contained harmful levels of benzene.

136.    Defendant had a duty to disclose material facts to Plaintiffs and Class members given its relationship as contracting parties and intended users of the Products. Defendant also had a duty to disclose material facts to Plaintiffs and Class members, namely that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

137.    Defendant knew or should have known that the Products were contaminated or risked being contaminated with benzene, but continued to manufacture, distribute, and sell them nonetheless. Defendant was required to engage in impurity testing to ensure that harmful

impurities such as benzene were not present in the Products. Had Defendant undertaken proper testing measures, they would have been aware that the Products contained dangerously high levels of benzene. During this time, Plaintiffs and Class members were using the Products without knowledge that the Products contained or risked containing dangerous levels of benzene.

138.    Defendant failed to discharge their duty to disclose these material facts.

139.    In so failing to disclose these material facts to Plaintiffs and Class members, Defendant intended to hide from Plaintiffs and Class members that they were purchasing and using the Products with harmful defects that were unfit for human use, and thus acted with scienter and an intent to defraud.

140.    Plaintiffs and Class members reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the defective Products manufactured and sold by Defendant had they known the Products contained unsafe levels of benzene.

141.    As a direct and proximate cause of Defendant's fraud, Plaintiffs and Class members suffered damages in the amount of monies paid for the defective Products.

142.    As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

**COUNT IV**
**FRAUDULENT CONCEALMENT**
**(On behalf of Plaintiffs and the Nationwide Class)**

143.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

144.    Defendant concealed and failed to disclose on the Products' packaging and labeling the material fact that the Products contained or risking containing benzene

145.    Defendant had knowledge that the Products contained or risked containing benzene.

146.    Defendant had a duty to disclose that the Products contained benzene or risked containing benzene

147.    Defendant had superior knowledge or means of knowledge available to them and knew that Plaintiffs and Class members would rely upon the representations and omissions of Defendant regarding the quality and ingredients of its Product. Consumers lack the meaningful ability to test or independently ascertain or verify whether a product contains benzene, especially at the point of sale.

148.    Defendant's concealment was material and intentional because people are concerned with what is in the Products that they are putting onto and into their bodies. Consumers such as Plaintiffs and Class members are influenced by the ingredients listed, as well as any warnings (or lack thereof) on the Products they buy. Defendant knows that if it had not omitted that the Products contained or even risked containing benzene, then Plaintiffs and Class members would not have purchased the Products; however, Defendant wanted to increase sales and profits.

149.    Defendant's concealment misled Plaintiffs and Class members as to the true nature of what they were buying and putting onto and into their bodies.

150.    Defendant fraudulently concealed that the Products contained or risked containing benzene.

151.    As a direct and proximate cause of Defendant's fraud, Plaintiffs and Class members suffered damages in the amount of monies paid for the defective Products.

152.    As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

<u>COUNT V</u>
**FRAUDULENT MISREPRESENTATION**
**(On behalf of Plaintiffs and the Nationwide Class)**

153.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

154.    Defendant made fraudulent misrepresentations to Plaintiffs and Class members regarding the Products.  Specifically, Defendant represented that the Products contained only those active and inactive ingredients listed on the Products' label, and not harmful carcinogens such as benzene.  However, these representations were not true because the Products contained benzene.

155.    As alleged above, Defendants knew or should have known that the Products contained or risked containing benzene.

156.    By knowingly misrepresenting these material facts—that the Products contained only the specific active and inactive ingredients listed on the label, none of which were benzene—Defendant intended to hide from Plaintiffs and Class members that they were purchasing and using adulterated and dangerous Products, and thus acted with scienter and an intent to defraud.

157.    Plaintiffs and the Class reasonably relied on Defendant's representations regarding the active and inactive ingredients in the Products and would not have purchased the Products or would have paid significantly less for them had Defendant represented on the Products' label that the Products contained benzene.  Indeed, Plaintiffs and Class members could not have purchased the Products had Defendant done this because the presence of benzene renders the Products adulterated, misbranded, and illegal to sell.

158.    As a direct and proximate cause of Defendant's fraudulent misrepresentations, Plaintiffs and the Class suffered damages in the amount of monies paid for the defective Products.

**COUNT VI**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiffs and the Nationwide Class)[38]**

159.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

160.    Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Products while misrepresenting and omitting material facts.

161.    Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Products at the expense of, and to the detriment or impoverishment of, Plaintiffs and Class members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

162.    Plaintiffs and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

163.    Defendant knowingly received and enjoyed the benefits conferred on them by Plaintiffs and Class members.

164.    It is inequitable for Defendant to retain the benefits conferred by Plaintiffs and Class members' overpayments.

165.    Plaintiffs and Class members seek establishment of a constructive trust from which Plaintiffs and Class members may seek restitution.

**COUNT VII**

---

[38] This count is plead in the alternative to Count I.

## VIOLATIONS OF NEW YORK GEN. BUS. LAW § 349
### (On behalf of Plaintiff Ahmed and the New York Subclass)

166.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

167.    N.Y. Gen. Bus. Law § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

168.    The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349, and as such, Plaintiff Ahmed and the New York Subclass members seek monetary damages against Defendant, enjoining them from inaccurately describing, labeling, marketing, and promoting the Products.

169.    Defendant misleadingly, inaccurately, and deceptively advertise and market its Product to consumers.

170.    Defendant's improper consumer-oriented conduct—including failing to disclose that the Products contain or even risk containing benzene and representing that the Products contained only listed active and inactive ingredients, none of which were benzene—is misleading in a material way in that it, *inter alia*, induced Plaintiff Ahmed and the New York Subclass members to purchase Defendant's Products and to use the Products when they otherwise would not have.

171.    Plaintiff Ahmed and the New York Subclass members were harmed by Defendant's conduct because Plaintiff Ahmed and New York Subclass members would not have purchased the Products but for Defendant's misrepresentations and omissions concerning the presence of benzene in the Products.  Accordingly, Plaintiffs and the New York Subclass members received less than what they bargained and paid for.

172.     Defendant's false, misleading, and deceptive representations and omissions have resulted in consumer injury or harm to the public interest.

173.     Defendant's advertising and Product packaging and labeling induced Plaintiffs and the New York Subclass members to buy Defendant's Products.

174.     Defendant's deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of N.Y. Gen. Bus. Law § 349(a) and Plaintiff Ahmed and the New York Subclass members have been damaged thereby.

175.     As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff Ahmed and the New York Subclass members are entitled to their actual damages or fifty dollars, whichever is greater, treble damages, and attorneys' fees and costs.

<u>**COUNT VIII**</u>
**VIOLATIONS OF NEW YORK GEN. BUS. LAW § 350**
**(On behalf of Plaintiff Ahmed and the New York Subclass)**

176.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

177.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

> False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

178.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under

the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

179.    Defendant's labeling and advertisements contain untrue and materially misleading statements and omissions concerning its Products inasmuch as they misrepresent that the Products are safe for use and do not list that the Products contain benzene.

180.    Plaintiff Ahmed and the New York Subclass members were injured by Defendant's conduct because they would not have purchased the Products but for Defendant's misrepresentations and omissions concerning the presence of benzene in the Products. Accordingly, Plaintiffs and the New York Subclass members received less than what they bargained and paid for.

181.    Defendant's advertising, packaging, and Product labeling induced Plaintiff Ahmed and the New York Subclass members to buy Defendant's Products.

182.    Defendant's conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

183.    Defendant made the material misrepresentations in its advertising and on the Products' packaging and labeling.

184.    Defendant's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the Products were and continue to be exposed to Defendant's material misrepresentations.

185.    As a result of Defendant's recurring, "unlawful" deceptive acts and practices, Plaintiff Ahmed and New York Subclass members are entitled to their actual damages or five hundred dollars, which is greater, treble damages, and attorneys' fees and costs.

**COUNT IX**

## VIOLATIONS OF THE OHIO CONSUMER SALES PROTECTION ACT
### Ohio Rev. Code § 1345.01, *et seq.*
### (On behalf of Plaintiff Harris and the Ohio Subclass)

186.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

187.    Plaintiff Harris and Ohio Subclass members are "consumers," as defined by ORC Ann. § 1345.01(D).

188.    At all times mentioned herein, Defendant engaged in a "consumer transaction" in Ohio, as defined in R.C. § 1345.01(A).

189.    Defendant has committed and continues to commit unfair and deceptive acts or practices in connection with a consumer transaction in violation of the Ohio Consumer Sales Practices Act, R.C. § 1345.01, *et seq.* ("OCSPA"), namely the sale of the Products to consumers in Ohio while making false and misleading statements concerning the content of the Products.

190.    The practice of making misrepresentations and material omissions regarding a consumer product has been previously determined to be deceptive or unconscionable under the OCSPA.[39]

191.    Defendant has unfairly and deceptively omitted and concealed material information related to the Products from consumers in violation of the OCSPA.

---

[39] Pursuant to Ohio Rev. Code Ann. § 1345.09(B), Defendant's alleged acts must have been previously declared to be deceptive or unconscionable under Ohio Rev. Code Ann. §§ 1345.02 or 1345.  Defendant systematically made misrepresentations and material omissions regarding the Products. Ohio courts have previously declared actions similar to that of the Defendant to be deceptive or unconscionable. *See, e.g., Arales v. Furs by Weiss, Inc*., No. 81603, 2003 WL 21469131, at *1-4 (Ohio Ct. App. June 26, 2003) (retailer's omission to consumer was unfair or deceptive).

192.    Defendant's unfair and deceptive practices deceived Plaintiffs and the Ohio Subclass and deceived a substantial segment of the target audience.

193.    Defendant's unfair and deceptive practices were material as it influenced purchasing and payment decisions.

194.    Plaintiff Harris and the Ohio Subclass have been damaged as a direct and proximate result of Defendant's deceptive and unfair practices.

195.    Defendant's conduct outlined herein violates the OCSPA.

196.    Plaintiff Harris and the Ohio Subclass are entitled to recover compensatory damages, plus interest, attorneys' fees, and costs.

197.    Defendant's conduct was intentional, willful, wanton, malicious, and egregious, entitling Plaintiffs and Ohio Subclass members to punitive damages and attorneys' fees in an amount to be determined at trial.

## COUNT X
### VIOLATIONS OF THE WEST VIRGINIA CONSUMER CREDIT AND PROTECTION ACT
### W. Va. Code § 46A-6-101, *et seq.*
### (On behalf of Plaintiff Harris and the West Virginia Subclass)

198.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

199.    Plaintiffs and West Virginia Subclass members are "consumers," as defined by W. Va. Code § 46A-6-102(2).

200.    Defendant engaged in "consumer transactions," as defined by W. Va. Code § 46A-6-102(2).

201.    Defendant advertised, offered, or sold goods or services in West Virginia and engaged in trade or commerce directly or indirectly affecting the people of West Virginia, as defined by W. Va. Code § 46A-6-102(6).

202.    Defendant engaged in unfair and deceptive business acts and practices in the conduct of trade or commerce, in violation of W. Va. Code § 46A-6-104, as described herein.

203.    Defendant's unfair and deceptive acts and practices also violated W. Va. Code § 46A-6-102(7), including: representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have; representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model if they are of another; advertising goods or services with intent not to sell them as advertised; engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding; using deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; and advertising, displaying, publishing, distributing, or causing to be advertised, displayed, published, or distributed in any manner, statements and representations with regard to the sale of goods that are false, misleading or deceptive or that omit to state material information which is necessary to make the statements therein not false, misleading, or deceptive.

204.    Defendant's unfair and deceptive acts and practices were unreasonable when weighed against the need to develop or preserve business, and were injurious to the public interest, under W. Va. Code § 46A-6-101.

205.    Defendant's acts and practices were additionally "unfair" under W. Va. Code § 46A-6-104 because they caused or were likely to cause substantial injury to consumers, which was not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

206.    The injury to consumers from Defendant's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury. The injury to consumers was substantial not only because it inflicted harm on a significant and unprecedented number of consumers, but also because it inflicted a significant amount of harm on each consumer.

207.    Consumers could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of consumer decision-making. By withholding important information from consumers, Defendant created an asymmetry of information between it and consumers that precluded consumers from taking action to avoid or mitigate injury.

208.    Defendant's business practices had no countervailing benefit to consumers or to competition.

209.    Defendant's acts and practices were additionally "deceptive" under W. Va. Code § 46A-6-104 because Defendant made representations or omissions of material facts that misled or were likely to mislead reasonable consumers, including Plaintiffs and absent West Virginia Subclass members.

210.    Defendant intended to mislead Plaintiffs and absent West Virginia Subclass members and induce them to rely on its misrepresentations and omissions.

211.    Defendant's representations and omissions were material because they were likely to deceive reasonable consumers.

212. Defendant had a duty to disclose material facts to consumers, including that the Products contain benzene. These material facts should have been disclosed because benzene is a known carcinogen and because Defendant had exclusive or superior knowledge regarding such facts.

213. Had Defendant disclosed to Plaintiffs and West Virginia Subclass that the Products contain benzene, Defendant would have been unable to sell as many of the Products that it did or at the price they were sold. Plaintiffs and absent West Virginia Subclass members acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

214. Defendant's omissions were legally presumed to be equivalent to active misrepresentations because Defendant intentionally prevented Plaintiffs and West Virginia Subclass members from discovering the truth regarding whether the Products contain benzene.

215. Defendant acted intentionally, knowingly, and maliciously to violate West Virginia's Consumer Credit and Protection Act, and recklessly disregarded Plaintiffs' and West Virginia Subclass members' rights. Defendant's unfair and deceptive acts and practices were likely to cause serious harm, and Defendant knew that its deceptive acts would cause harm based upon its business practices and exclusive knowledge of the omissions and misrepresentations herein.

216. As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiffs and absent West Virginia Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages.

217. Defendant's violations present a continuing risk to Plaintiffs and absent West Virginia Subclass members as well as to the general public.

218.    Defendant received direct, mailed notice from individuals related to the claims at issue in this Consolidated Amended Complaint, and specifically Defendant's unfair and deceptive trade practices. Plaintiff Harris mailed a notice letter to Defendant on December 14, 2021, to inform it of its unlawful conduct. Plaintiff's letter provided notice of Defendant's violations and demanded that Defendant correct or rectify the conduct complained of herein.

219.    Furthermore, affording Defendant an opportunity to cure its unlawful conduct would be unnecessary and futile here. Defendant was placed on reasonable notice of the defect in the Products and unlawful conduct by the Valisure Citizen Petition. Accordingly, Defendant had had ample opportunity to cure the defect for Plaintiffs and Class members but has failed to do so.

220.    Defendant also has notice of its unlawful conduct as set forth herein by virtue of the news reports surrounding this subject.

221.    Plaintiffs and West Virginia Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $200 per violation under W. Va. Code § 46A-6-106(a), restitution, injunctive and other equitable relief, punitive damages, and reasonable attorneys' fees and costs.

## COUNT XI
### VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### Fla. Stat. § 501.201, *et seq.*
### (On behalf of Plaintiff Van der Steeg and the Florida Subclass)

222.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

223.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204.

224.    Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

225.    FDUPTA can be violated in two ways, both of which are relevant to this case. First, Defendant have committed a "traditional" violation of FDUPTA by engaging in unfair or deceptive acts and practices which caused injury to Plaintiff Van der Steeg and Florida Subclass members.

226.    Second, Defendant have committed a *per se* violation of FDUPTA predicated on a violation of the FDCA. Specifically, by manufacturing, distributing, and selling adulterated and misbranded Products which is *per se* illegal in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352 of the FDCA, and because the FDCA is designed to protect consumers from harmful and dangerous drugs, Defendant have committed *per se* violations of FDUPTA. Fla. Stat. Ann. § 501.203(3)(c) (explaining that a FDUPTA violation may be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.").

227.    While FDUPTA does not define "deceptive" or "unfair," Florida courts have looked to the Federal Trade Commission's interpretations for guidance. "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal quotation marks and citation omitted). Courts define a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers. *Fed. Trade Comm'n v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016). Courts define an "unfair trade practice" as any

act or practice that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010).

228.    Defendant engaged in conduct that is likely to deceive members of the public. This conduct includes representing that the Products contained only the ingredients listed in the label, which is untrue, and failing to make any mention that the Products contained or risked containing any harmful levels of benzene.

229.    As alleged herein, Plaintiff Van der Steeg suffered injury in fact and lost money as a result of Defendant's conduct because they purchased the Products from Defendant in reliance on Defendant's representation that the Products were safe and effective and not contaminated or risked being contaminated with benzene, as well as Defendant's material omissions regarding the true nature of the Products.

230.    As alleged herein, Defendant's actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff Van der Steeg and the Florida Subclass to damages and relief under Fla. Stat. §§ 501.201-2

231.    By committing the acts alleged above, Defendant engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

232.    Defendant's conduct is substantially injurious to consumers. Consumers are purchasing and using Defendant's Products without knowledge that the Products are adulterated with a human carcinogen. This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for the Products, which are contaminated or risked being contaminated with benzene, but for Defendant's false labeling, advertising,

promotion, and material omissions. Thus, Plaintiff Van der Steeg and the Florida Subclass have been "aggrieved" (*i.e.*, lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

233.    Indeed, no benefit to consumers or competition results from Defendant's conduct. Because consumers reasonably rely on Defendant's representation of the ingredients contained on Products' label and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

234.    Further, Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Plaintiff Van der Steeg desires to purchase Defendant's Products in the future if she can be assured that the Products are not adulterated or misbranded and meet the advertising claims on the Products' label.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for relief and judgment against Defendant as follows:

    a.  Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiffs as representatives of the Class and Subclasses, and designating Plaintiffs' counsel as Class Counsel;

    b.  Awarding Plaintiffs and Class members compensatory damages, in an amount exceeding $5,000,000, to be determined at trial;

    c.  Awarding Plaintiffs and Class members appropriate relief, including but not limited to actual damages;

    d.  For declaratory and equitable relief, including restitution and disgorgement;

e.   For an order enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

f.   Awarding Plaintiffs and Class members the costs of prosecuting this action, including expert witness fees;

g.   Awarding Plaintiffs and Class members reasonable attorneys' fees and costs as allowable by law;

h.   Awarding pre-judgment and post-judgment interest;

i.   For punitive damages; and

j.   Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all claims so triable.


Dated: July 25, 2022                    Respectfully submitted,

*/s/ Charles E. Schaffer*

Charles E. Schaffer, Esq. *(pro hac vice)*
David C. Magagna Jr., Esq. *(pro hac vice)*
Nicholas J. Elia, Esq.
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
cschaffer@lfsblaw.com
dmagagna@lfsblaw.com

Jason P. Sultzer, Esq.
Joseph Lipari, Esq.
Daniel Markowitz, Esq.
**THE SULTZER LAW GROUP P.C.**
270 Madison Avenue, Suite 1800
New York, NY 10016
Tel: (845) 483-7100
Fax: (888) 749-7747

sultzerj@thesultzerlawgroup.com
liparij@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

James R. Cummins, Esq.
**CUMMINS LAW LLC**
Scripps Center
312 Walnut Street, Suite 1530
Cincinnati, Ohio 45202
Tel: (513) 721-9000
Fax: (513) 721-9001
jcummins@cumminslaw.us

Mark S. Reich, Esq.
Courtney E. Maccarone, Esq.
**LEVI & KORSINSKY, LLP**
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
mreich@zlk.com
cmaccarone@zlk.com

Sarah N. Westcot, Esq. (*pro hac vice*
forthcoming)
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Fax: (305) 676-9006
swestcot@bursor.com

Max S. Roberts
**BURSOR & FISHER, P.A.**
888 Seventh Avenue
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
mroberts@bursor.com